**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WSFS FINANCIAL CORPORATION,** and | : | |
| **WILMINGTON SAVINGS FUND** | : | **CIVIL ACTION** |
| **SOCIETY, FSB** d/b/a **WSFS BANK** | : | |
| Plaintiffs, | : | |
| **v.** | : | |
| | : | |
| **RICHARD K. COBB, JR.,** and | : | **NO. 2:22-cv-815-MRP** |
| **F. CHRISTOPHER CAMPBELL** | : | |
| Defendants. | : | |

**Perez, J.**                                                                                          **July 14, 2023**

<u>**MEMORANDUM**</u>

## I.      BACKGROUND

The instant case arises from an employment dispute raising claims of breach of contract, violation of Pennsylvania Wage Payment and Collection Law, and tortious conduct under Pennsylvania common law. The matter now comes before this court on cross-motions for summary judgement.

Plaintiffs WSFS Financial Corporation ("WSFS Financial") and Wilmington Savings Fund Society, FSB d/b/a WSFS Bank ("WSFS Bank") (collectively, "WSFS" or "Plaintiff") are the corporate successor by merger of The Bryn Mawr Trust Company ("BMT"). The Defendants are Richard K. Cobb, Jr, WSFS's former Senior Vice President of Wealth Management ("Cobb") and F. Christopher Campbell, WSFS's former Vice President of Wealth Management ("Campbell") (collectively, "Defendants").

### A.  Brokerage Services Agreement

BMT is not a licensed broker-dealer so they cannot provide clients with wealth management or financial advising services. Am. Answer & Countercl. to Am. Compl. by Def. Richard K. Cobb, Jr. ¶11, ECF No. 38. To fill this gap in their business, BMT entered into a Brokerage Services Agreement ("BSA") with Cresap, Inc. ("Cresap"), who is a licensed broker-dealer, on May 15, 2009. Brokerage Serv. Agreement, ECF No. 48-7. The BSA provided for the hiring of dual employees who would have simultaneous but distinct employment relationships with BMT and Cresap, serving both entities as members of the Asset Management Group ("AMG"). Id. at ¶7. The AMG was comprised of five employees: Cobb, Campbell, Financial Advisor John Ulrich, Client Relations Manager Tara Cedatol, and Client Service Associate Jessica Wilf. First Am. Compl. for Inj. Relief & Damages ¶¶12, 40; Brokerage at ¶3. Under the terms of the BSA, the dual employees functioned as Registered Representatives of Cresap to provide wealth

management services to clients but were paid by BMT and worked out of BMT offices. Brokerage at ¶¶5(a), 7. Service fees were collected from client accounts by Cresap, who retained a set percentage of the fees and paid the remaining balance to BMT. Id. at ¶7(a). BMT then distributed a percentage of the fees to the dual employees and retained the rest. Id.

Both Cobb and Campbell serviced clients that were referred to them by BMT, as well as other clients that were not affiliated with BMT. Campbell Dep. 75:4-7, 73:4-24, 75:8-17, ECF No. 52-6; Cobb Dep. at 67:14-76:7, 76:8 - 82:16. Defendants publicly carried themselves out to be affiliated with BMT and boasted BMT's reputation in their communications with clients and the public. Cobb Dep. at 120:5-21; Resp. in Opp'n re Joint Mot. for Summ. J. 3-4, ECF No. 52.

While BMT referred some banking clients to the AMG, the terms of the BSA maintained clear separation between the businesses of BMT and Cresap. See Cobb Dep. 39:7-10, ECF No. 52-5; Brokerage at ¶5(b)("customers will enter into separate customer or account agreements with [Cresap] from the customer or account agreements with [BMT]"); Id. at ¶11(a)("[Cresap and BMT] shall each maintain strict and total separation of their businesses from the business conducted at the [Broker Center], including separation of records and of physical facilities"). Pursuant to this separation requirement, all AMG client information was stored and maintained by Cresap and their affiliated clearing firm, First Clearing. Wellman Dep. 247:14-248:16, ECF No. 48-5; *see also* Ulrich Dep. 63:15-17, ECF No. 50-1. BMT did not have access to the information of AMG clients, unless the client signed a disclosure agreement. Brokerage at ¶24(b). Approximately 10% of AMG clients signed an agreement granting BMT access to their information. Wellman Dep. at 256:15-20.

## B. Defendants' Agreements

Campbell began working for BMT in 1998 and signed a Non-Disclosure and Non-Solicitation Agreement in 2008. Am. Compl. at ¶¶ 19-20. Cobb began working for BMT and signed a Non-Disclosure and Non-Solicitation Agreement in 2009. Id. ¶¶14-16. The Agreements read, in relevant part, as follows[1]:

2. <u>Non-Disclosure.</u> Except in connection with the performance of Employee's duties in the course of his employment, Employee agrees that Employee will not, either directly or indirectly, for competitive or other purposes, disclose, cause to be disclosed, use or cause to be used, any Confidential Information of Employer or Affiliates or their clients, either during Employee's employment or at any time thereafter…

3. <u>Non-Interference.</u> … Employee shall not disrupt, damage, impair or interfere with the business of Employer or Affiliates in any manner, including without limitation, inducing any employee to leave the employ of Employer or Affiliates or inducing any client or business referral source to sever its relationship with Employer or Affiliates…

---

[1] Campbell made some minor changes to the reproduced language of the Agreement by striking certain portions out and writing in additional words. Non-Discl. and Non-Solic. Agreement, Jan. 2, 2008, ECF No. 48-28. None of these edits alter the relevant substance of the Agreement.

4. <u>Non-Solicitation.</u> … Employee shall not, directly or indirectly, accept any business from, or solicit, induce, or attempt to induce, any person or entity who has been a client or business referral source of Employer…

Non-Discl. and Non-Solic. Agreement, May 15, 2009, ECF No. 48-27

Cobb also signed a Restricted Stock Unit Agreement ("RSU") in 2021, which provided that Cobb receive a total of 428 time and performance based restricted stock units between February 11, 2021, and February 11, 2024. Restricted Stock Unit Agreement for Execs., ECF No. 48-37. The RSU provided that all remaining units would be deemed to have vested upon a change of control of BMT, and that any unvested units would be forfeited if Cobb engaged in certain conduct harmful to BMT. Id. at ¶¶7, 4.b. Paragraph eight of the RSU includes a Non-Interference and Non-Solicitation provision which is substantially similar to the agreement signed by Cobb in 2009. Id. at ¶8.

**5. Merge and Resignation**

On March 10, 2021, WSFS and BMT announced that BMT would merge into WSFS. Am. Compl. at ¶¶30-31. The merge was effectuated on January 1, 2022. Id. at ¶39.

In the months following the announcement of the merge, WSFS began planning for the transfer of employees and clients. Am. Compl. at ¶¶ 33-34. Like BMT, WSFS is not a licensed broker-dealer and so must affiliate with a broker-dealer to offer wealth management services to banking clients. WSFS announced their intention to transition BMT's broker-dealer relationship from Cresap to Commonwealth Financial Network ("Commonwealth") upon merge. Id. at ¶ 32. To effectuate this transfer, Defendants would be required to terminate their employment with Cresap, and clients would be required to close their account with Cresap and open a new account with Commonwealth, a process referred to as "repapering". Wellman Dep. at 71:22-72:20; Ulrich Dep. 60:12-19, 63:15-64:1, ECF No. 50-1. Neither the AMG employees nor clients were required to move from Cresap to Commonwealth, however, it was WSFS's expectation that Defendants and Ulrich would persuade all customers to move their accounts. Answer & Countercl. at ¶2; Wellman Dep. at 32:16-33:14.

Defendants expressed their concerns to representatives of BMT and WSFS about transferring to the Commonwealth platform multiple times. Fox Dep. at 70:1-74:22, ECF No. 48-6. Specifically, Defendants said they did not believe Commonwealth was as good of a provider as Cresap, that clients may not want to move, and that Defendants would likely lose money. Wellman Dep. at 69:11-72:5; 74:11-75:1; 90:23-91:6; Campbell Dep. at 227:7-229:25. Despite these complaints, Defendants continued to engage with Commonwealth and WSFS as they prepared for a transfer. They met with Commonwealth representatives, visited Commonwealth's offices, and signed offer letters presented to them by WSFS. Wilf Dep at 137:4-25, ECF No. 48-16; Cobb Offer Letter, ECF No. 48-31; Campbell Offer Letter, ECF No. 48-32.

Simultaneously, Defendants coordinated with Mark Cresap to prepare to resign from WSFS and work directly with Cresap. Cobb Dep. at 143:45-55; Campbell Dep. at 131:64-68. They created a new brand, 76 Wealth Management, and designed office space from which they could work directly with Cresap. Am. Compl. at ¶ 39; Campbell Dep. at 102:5-21. Defendants had consistent communications with each other and with Wilf and Cetadol regarding their plans with Cresap. See ECF No. 52-16,21,22,36,39,41. WSFS offered a retention bonus to Cobb to incentivize him to continue his employment with WSFS, but chose not to offer retention bonuses to Campbell or Ulrich. Cobb Offer Letter; Fox Dep. at 187:20-24; 214:15-24. Rather than offer Campbell and Ulrich a tangible incentive to continue employment, WSFS "relied on the strength of Mr. Cobb in keeping his team together." Fox Dep. at 214:20-21.

Following the announcement of the merge, WSFS communicated to Defendants that they would continue their relationship with Cresap for some time following the effectuation of the merge, allowing Defendants to maintain access to client accounts as needed to "repaper" clients to Commonwealth. Fox Dep. at 77:3-21; Bacci Dep. 120:2-10, ECF No. 48-13.  Defendants state that they hoped WSFS would change their mind about transferring to Commonwealth during this transitionary time and choose to continue their partnership with Cresap. However, at some point in late December of 2021, WSFS informed Defendants that their transition plan changed, and that Defendants would be expected to resign from Cresap effective immediately on January 3, 2022. Tr. of Oral Arg. on Mot. for Summ. J. at 66:20-25, ECF No. 62.

In the final days of December 2021 and the start of January 2022, Cobb and Wilf each emailed numerous documents from their BMT email addresses to their personal email addresses. See Wilf email, January 2, 2022, ECF No. 52-365; Cobb email, December 27, 2021, ECF No. 52-34; Cobb email, December 28, 2021, ECF No. 52-33. Cobb does not refute sending such emails but maintains that all information included in the emails was already available to Cresap and not confidential to BMT. Tr. of Oral Arg. at 14:17-20.

On January 3, 2022, the first business day following effectuation of the merge and the date on which WSFS instructed Defendants to resign from Cresap, Defendants resigned from WSFS effective immediately. Am. Compl. at ¶ 39; Cobb Resignation Letter, ECF No. 52-31; Campbell Resignation Letter, ECF No. 52-32. Cedatol and Wilf also resigned on the same day. Am. Compl at ¶ 40. On January 4, 2022, Campbell sent the following email to his clients:

> I hope you had a nice holiday season and Happy New Year to you!
>
> I am pleased to announce that, after 23 years with the Bryn Mawr Trust Company, I have decided to pursue an opportunity to remain with and affiliate exclusively with First Clearing LLC and Cresap Inc. I will continue to be employed with Cresap and will be joining their office in Radnor. My updated contact information is provided below:
>
> Chris Campbell
> 76 Wealth Partners LLC

> c/o Cresap Inc.
> 259 North Radnor Chester Road, Suite 140
> Radnor, PA 19087
> Office 610-341-1320
> Cell 610-256-4874

> Feel free to reach out to me if you have any questions. Thanks again.

Chris Campbell Announcement, January 4, 2022, ECF No. 52-38.

Ulrich resigned from his employment with WSFS effective immediately on January 5, 2022. He began working directly for Cresap as an independent contractor and is not affiliated with either Defendant. Ulrich's independence is "common knowledge" within WSFS. Fox Dep. at 186-187. As of Ulrich's resignation, all former members of the AMG now work for Cresap and not WSFS, and only a small portion of AMG clients repapered to Commonwealth. See Cresap Dep. 7:21-8-16, ECF No. 52-17; Former Clients of BMT Co. AMG, ECF No. 52-37.

## II.    PROCEDURAL HISTORY

WSFS filed their first Complaint on March 4, 2022, raising the following claims:

|   |   |
|---|---|
| I. | Breach of Fiduciary Duty of Loyalty – Cobb and Campbell |
| II. | Breach of Contract – Cobb |
| III. | Breach of Contract – Campbell |
| IV. | Tortious Interference with Contracts – Cobb and Campbell |
| V. | Tortious Interference with Business Relationships – Cobb and Campbell |
| VI. | Unfair Competition – Cobb and Campbell |
| VII. | Civil Conspiracy – Cobb and Campbell |
| VIII. | Unjust Enrichment – Cobb and Campbell |

ECF No. 1. Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) on May 6, 2022, which was denied by Judge Wolson on August 10, 2022. ECF Nos. 17-18, 29. Plaintiff filed an Amended Complaint on August 12, 2022, and Defendants filed respective Answers to the Complaint on August 26, 2022. ECF Nos. 30, 32-33. Pursuant to Judge Wolson's September 23, 2022 Order, Cobb and Campbell filed Amended Answers on September 26, 2023 and September 27, 2023 respectively. ECF Nos. 37-39. Cobb's Amended Answer also included two counterclaims: Breach of the RSU and Violation of the Wage Payment and Collection Law ("WPCL"). ECF No. 38. Plaintiff filed a Response to Cobb's Counterclaims on September 29, 2022. ECF No. 40.

The case was reassigned to the undersigned Judge on February 6, 2023. Consistent with this Court's February 23, 2023 Scheduling Order, Defendants filed a Joint Motion for Summary Judgement on April 21, 2023. ECF No. 48-49. Plaintiff filed a Response in Opposition to the Motion and Cross-Motion for Summary Judgement on May 5, 2023, and Defendants submitted a Reply Memorandum. ECF Nos. 52, 55.

### III.    ANALYSIS
### A.  Summary Judgement Standard

Fed. R. Civ. P. 56(a) requires a court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A plaintiff cannot rest on unsubstantiated allegations in the pleadings; rather, once the movant satisfies its burden of showing evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to show specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Further, when Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

### B.  Breach of Contract (Counts II and III)

To succeed on a breach of contract claim, a plaintiff must demonstrate "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir.2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Under Pennsylvania law, restrictive covenants are enforceable "only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer." *Socko v. Mid-Atl. Sys. of CPA, Inc*., 126 A.3d 1266, 1274 (Pa. 2015)

A restrictive covenant may be entered into prior to, during, or after the conclusion of an employment relationship. *Socko*, 126 A.3d at 1274. Where a restrictive covenant is required after an employee has commenced their employment, it is enforceable only if it is accompanied by some "new and valuable consideration—that is, some corresponding benefit or a favorable change in employment status." *Id.* at 1275. Pennsylvania courts have found sufficient new and valuable consideration where employees have received, for example, "a promotion, a change from part-time to full-time employment, or even a change to a compensation package of bonuses, insurance benefits, and severance benefits." *Id.* (footnotes omitted). Pennsylvania courts have further found that "the mere continuation of the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant." *Id.*

As a threshold matter, Defendants each argue that the restrictive covenants they signed in the course of their employment with BMT are not enforceable. Campbell began working for BMT in 1998 and signed a Non-Disclosure and Non-Solicitation Agreement in 2008. Am. Compl. at ¶20. He argues that this agreement is not enforceable because it was not accompanied by any new and valuable consideration. Plaintiff states that Campbell received a promotion, including the title of

Vice President of Wealth Management and a bonus, but Defendant asserts that he already had this title and any bonus received around the time of his signing the agreement was an annual bonus which was unrelated to the agreement. Campbell Dep.at 174:5–9, 174:20–23, 175:10–11, 281:22–282:3.

Cobb began working for BMT and signed a Non-Disclosure and Non-Solicitation Agreement in 2009, however, the exact date of his agreement is not clear. Am. Compl. at ¶15. Cobb's position is that the agreement was signed more than a month after his employment commenced and that it was not previously discussed when he negotiated the terms of his employment. Cobb Dep. at 16:13-20; Tr. of Oral Arg. at 13:3-11. However, Plaintiff argues that it was signed by Cobb on the first day of his employment and was previously discussed as part of his negotiations with Frank Leto. Resp. in Opp'n re Joint Mot. for Summ. J. 18-19, ECF No. 52. Determining the enforceability of each Defendant's Non-Disclosure and Non-solicitation Agreements requires answering disputed questions of fact regarding the timing of the signatures and consideration given. Therefore, these issues must be presented to the jury.

Assuming for the purposes of this discussion that the restrictive covenants are enforceable, this Court now turns its attention to Plaintiff's allegations that Defendants breached their Non-Disclosure and Non-Solicitation Agreements when they: (a) induced AMG employees to terminate their employment with WSFS, (b) solicited AMG clients, and (c) misappropriated BMT's confidential information.

### a) Inducement of AMG Employees

First, Plaintiff alleges that Defendants induced the entire AMG to resign, in violation of their restrictive covenants. This includes Ulrich, Cedatol, Wilf, and each other.

It is undisputed that, like Defendants, Ulrich resigned from WSFS and continued his employment exclusively with Cresap. While there is evidence showing that Defendants some communications with Ulrich about Cresap, there is no evidence in the record indicating that Defendants took any steps to persuade Ulrich to resign from BMT or WSFS. Short Message Report, 52-40; Ulrich Dep. at 83:13-85:23. It is undisputed that Ulrich works directly for Cresap as an independent contractor and does not have any affiliation or revenue sharing structure with Defendants. Ulrich Dep. at 18:17-18. He resigned two days after Defendants, Wilf, and Cedatol resigned, and multiple WSFS employees stated in their depositions that it was clear and widely known that Ulrich's resignation was unrelated to Defendants'. See Wellman Dep. at 188:4-5 ("It was apparent he was not joining Chip [Cobb] and his team…"); Fox Dep. 187:5-15 ("It just became common knowledge … [t]hat John [Ulrich] wasn't affiliated with them.").

It is further undisputed that Defendants, Cedatol, and Wilf all coordinated with each other and with Mark Cresap to prepare for their future employment with Cresap prior to terminating their employment with WSFS. While there is no direct evidence showing that Defendants explicitly instructed or encouraged each other or any other employee to resign from WSFS, there is ample evidence which could allow a jury to find that the employees were induced. Cobb and Campbell exchanged texts and emails with each other and with Wilf and Cedatol in which they discussed their future office space, arranged to receive Cresap-issued laptops, coordinated the timing of their resignations, and more. See Cobb Dep. at 282:24–284:22; ECF No. 52-

16,21,22,36,39,41. Whether Defendants' coordination constitutes "inducing [an] employee to leave the employ of the employer" in violation of their Agreements is a question of fact to be determined by the jury.

### b) Solicitation of AMG Clients

Next, Plaintiffs allege that Defendants solicited WSFS clients in violation of their restrictive covenants when they sent the January 4, 2022, email to their clients.

The Financial Industry Regulatory Authority ("FINRA") standards of professional conduct allow for announcements of changes in employment and prevent interference with a customer's request to transfer his or her account. See FINRA Rule 2140 (generally prohibiting interference with the transfer of customer accounts). Courts interpreting the undefined term "solicitation" in a restrictive covenant have found that an announcement of a change of employment is not actionable solicitation. See *Pharmerica Corp. V. Sturgeon*, 2018 U.S. Dist. LEXIS 43236 (W.D. Pa 2018) (holding an employee did not violate the non-solicitation provision of a restrictive covenant where he sent an email which "did not invite or solicit the clients/customers to move their business away from [Employer] and to [Competitor]" or "disclose any confidential information or trade secrets of [Employer].")

The email sent by Defendants to their clients was not a solicitation as a matter of law. Rather, it was merely notice of a change in their employment status. The email did not disclose any confidential information and nothing in the email can be read as an invitation to the clients to move their business. In fact, no client did move their business or alter their accounts in any way.

Even if the email contained language which could be read as a solicitation, the claim would still fail as a matter of law. It is undisputed that the clients serviced by the AMG held contracts directly with Cresap. WSFS argues that referral and fee structure created a relationship with the clients that made them jointly owned by WSFS and Cresap. However, the terms of the BSA plainly required BMT and Cresap to maintain separate relationships with their respective clients. AMG clients received wealth management services from AMG wealth financial advisors according to agreements held with Cresap. While some of those individuals also received banking services according to agreements held with WSFS, those agreements were distinct, and the relationship separate pursuant to the terms of the BSA. Plaintiff has not identified any behavior by Defendants which could constitute inducing WSFS clients to end their banking relationship with WSFS. In effect, Plaintiff argues that Defendants refused to solicit Cresap clients away from Cresap in favor of Commonwealth, a competitor with whom WSFS had a pre-existing relationship.

In short, Defendants did not solicit WSFS clients in violation of their Non-Solicitation Agreements as a matter of law.

### c) Misappropriation of Confidential Information

Finally, Plaintiff alleges that Defendants violated their restrictive covenants when they deleted data from their phones and emails, and that Cobb misappropriated confidential information when he sent BMT data to his personal email address and instructed Wilf to do the same.

In his deposition, Cobb indicated that he did email himself documents prior to resigning from WSFS and those emails contained both Cresap information and BMT information. Cobb Dep. at 276:3-20. Cobb argues, however, that all information sent was also accessible by Cresap so it was not protected and he and Wilf maintain that he did not instruct Wilf to send any emails. Tr. of Oral Arg. at 14:17-19; Wilf Dep. 224:3-17, ECF No. 48-16. Defendants also do not refute the allegation that they deleted data from their phones and computers prior to resigning. See ECF Nos. 52-36,39. The nature of the information retained and deleted, whether Defendants directed the actions of Wilf, and how Defendants used any information retained are questions of fact to be decided by a jury.

In sum, Plaintiff's claims for Breach of Contract against each Defendant must proceed so that a jury may determine: if Campbell received additional consideration when he signed his Agreement in 2008; if Cobb signed his Agreement at the time of his hiring, and if not, if he received additional consideration; if Defendants induced Wilf, Cedatol, and each other to end their employment with WSFS; If Cobb instructed Wilf to email confidential data to herself, and; if the information Cobb emailed to himself was confidential and used in a manner which undermined WSFS.

### C. Breach of Fiduciary Duty (Count I)

In addition to breaching duties imposed under their contracts, Plaintiff's also allege that Defendants breached a fiduciary duty. Pennsylvania law dictates that employees, as the agents of their employer, owe their employers a duty of loyalty." *Synthes, Inc. v. Emerge Med*., Inc., 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014). To establish a breach of this duty, WSFS must demonstrate that: "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit … was a real factor in bringing about plaintiff's injuries." *McDermott v. Party City Corp*., 11 F. Supp. 2d 612, 626 (E.D. Pa. 1998).

"[E]mployees at will do not breach a fiduciary duty to the employer by making preparations to compete upon termination of employment provided the employee does not use the confidential information of his employer, solicit the customers of his employer, or otherwise engage in conduct directly damaging his employer during the period of employment." *Oestreich v. Environ. Inks & Coatings Corp.*, 1990 WL 210599, at *6 (E.D.Pa. Dec. 17, 1990). "Thus, before the close of his employment, an employee may purchase a rival business and, upon the termination of the agency, immediately compete with his former employer. He may not, however, 'solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's.'" *Synthes, Inc*., F. Supp.

3d at 667 (quoting Restatement (Second) Agency § 393, cmt. e (1958)). *See also Spring Steels, Inc. v. Molloy*, 162 A.2d 370, 375 (Pa. 1960) ("Even before the termination of agency, [the employee] is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein."). Judge Rufe explained this rule more succinctly:

> Pennsylvania law permits an agent or employee to "make arrangements to compete," but prohibits him from using "confidential information peculiar to his employer's business and acquired therein." Within this framework, an employee may properly inform customers of his current employer that he is leaving the employer to work elsewhere in the field, or to start his own competing business. In contrast, an employee who, while still working for her employer, makes improper use of her employer's trade secrets or confidential information, usurps a business opportunity from the employer, or, in preparing to work for a rival business, solicits customers for such rival business, may be liable for a breach of the duty of loyalty.

*Bro–Tech Corp. v. Thermax, Inc.*, 651 F.Supp.2d 378, 414 (E.D.Pa. 2009) (footnotes omitted).

Defendants argue that they could not breach a fiduciary duty of loyalty owed to Plaintiff by acting in the interest of Cresap because they were dual employees of BMT and Cresap. However, the Third Restatement of Agency specifies that where an employee serves two principles, they owe a fiduciary duty to both and should not act in a manner that breaches their duty to one on behalf of the other. See Restatement (Third) Of Agency § 8.06, Comment D.2. (2006). Therefore, Defendants can be found to have breached their duty to BMT/WSFS even where they were acting in the interest of Cresap.

Plaintiff alleges that Defendants breached the fiduciary duty of loyalty owed to BMT as their employer when they: lied about their intent to continue working for WSFS while simultaneously preparing to work directly for Cresap, solicited BMT clients, solicited other BMT employees, and sent confidential information to their personal email address.

Whether Defendants knew for certain that they would stay with Cresap and actively lied to BMT about their plans or remained uncertain of their plans until the final days is a disputed question of fact. However, this question of fact is not material because, even if they did know for certain that they would resign, Defendants had no obligation to inform WSFS of that intention and were free to make plans for their next employment.

The record is devoid of any evidence tending to show that Defendants made any effort to solicit BMT customers prior to the termination of their employment. The email sent by Defendants to their clients on January 4, 2022, cannot carry a claim for breach of fiduciary duty because it was sent after their employment was terminated and because it was not a solicitation as a matter of law. Defendants' employment relationship with BMT terminated upon the effectuation of the merge on January 1, 2022, and their employment relationship with WSFS terminated when Defendants formally resigned on January 3, 2022. Defendants no longer owed BMT or WSFS a fiduciary duty of loyalty when they emailed their clients on January 4, 2022.

Plaintiff has not alleged or presented any evidence showing that Defendants solicited clients in any way other than the January 4, 2022 email. Additionally, even if the email had been sent while Defendants owed a fiduciary duty, the claim would still fail because the email was not solicitation as a matter of law. Rather, Defendants simply informed their clients that they were leaving their current employer to work elsewhere. No language in the email can be read as a suggestion that any client make any change to their accounts or business, and in fact, no client did move their business.

As previously discussed, the record clearly shows that Ulrich's resignation was unrelated to Defendants'. Ulrich resigned after the other AMG employees and began working directly for Cresap in a manner which is wholly independent of Defendants. Ulrich Dep. at 20:2-20. The record also clearly shows that Defendants coordinated their resignations with each other and with Wilf and Cedatol. The jury must decide whether this coordination constitutes solicitation and, if it does, whether such solicitation constitutes "conduct directly damaging" BMT.

It is undisputed that Cobb and Wilf sent emails containing documents from their BMT email addresses to their personal email addresses at some time in late December of 2021. Cobb Dep. at 276:3-20. The contents and nature of these documents, however, is in dispute. Plaintiff argues that the emails contained confidential BMT information and that the timing of the transfer supports an inference that the information was used for the benefit of Cresap. Meanwhile, Cobb argues that all information sent was also accessible by Cresap and it was not used for competitive purposes. Whether the information was peculiar to BMT and not also available to Cresap, and whether the information was misused are disputed questions of fact which must be submitted to the jury. Accordingly, Plaintiff's fiduciary duty claim can proceed against Cobb on this basis.

Plaintiff also attempts to argue that Defendants breached their fiduciary duty by intentionally resigning at a time which would maximize damage to Plaintiff. However, Plaintiff has failed to identify any case law indicating that an at-will employee must consider the effect of the timing of their resignation on their employer, and none where an employee was found liable for the impact of any inconvenience caused to their employer by the timing of their resignation. As at-will employees, Defendants had no obligation to resign at a time that was convenient for WSFS.

Plaintiff's claim for Breach of Fiduciary Duty must survive summary judgment on the merits because disputed questions of fact remain as to whether Defendants solicited BMT employees in a manner which directly damaged BMT and whether Cobb misappropriated confidential information which was peculiar to BMT when he emailed documents to his personal email address prior to resigning.

**D.  Tortious Interference (Counts IV and V)**

In counts four and five, WSFS alleges that Defendants tortiously interfered with three sets of relationships: a) prospective at will employment relationships between the AMG employees and WSFS, b) contractual relationships with the AMG clients, and d) business relationships with the AMG clients.

The Third Circuit has defined the elements of Tortious Interference as follows:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Acumed L.L.C. v. Advanced Surgical Serv., Inc.*, 561 F.3d 199, 212 (3d Cir.2009).

### a) Prospective Employment Relationships

Claims for tortious interference with an at-will employment relationship may be brought only for interference with *prospective* at-will employment contracts, not *existing* ones. *Salsberg v. Mann*, 262 A.3d 1267, 1270 (Pa.Super. 2021) (citing *Hennessy v. Santiago*, 708 A.2d 1269, 1279 (Pa. Super. 1998)). In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts have considered whether the evidence supports a finding that there was an objectively "reasonable likelihood or probability" that the contemplated contract would have materialized absent the defendant's interference. *Acumed LLC.*, 561 F.3d at 212(citing *Brokerage Concepts, Inc. v. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998)). A "reasonable likelihood" of occurrence is something less than a contractual right but more than a mere hope that there will be a future contract. Furthermore, a plaintiff must base its claim that there was a prospective contractual relationship on something other than an existing or current relationship. *Id.* "[A] cause of action exists where a person intentionally and improperly interferes with 'another's prospective contractual relation.' Moreover, that interference must induce or cause a third person not to enter into the prospective relationship." *Hennessy,* 708 A.2d at 1278 (quoting *Yaindl v. Ingersoll-Rand Co*., 422 A.2d 611 (Pa.Super. 1980)). The rule set forth in Hennessy was adopted by the Eastern District of Pennsylvania in *Pride v. Wal-Mart Stores E., LP*, 2019 U.S. Dist. LEXIS 194283 (E.D. Pa. 2019).

In the present case, Plaintiffs allege that Defendants tortiously interfered with the prospective employment relationships between the AMG employees and WSFS. This argument fails as a matter of law, as all members of the AMG did enter into employment relationships with WSFS. Under *Hennessey*, Plaintiff's claim can only succeed if Defendants' conduct caused the AMG employees not to enter into the prospective employment relationship with WSFS. All AMG employees did enter into employment relationships with WSFS on January 1, 2022, and then terminated their existing employment relationships in the following week. The fact that the employees resigned within a matter of days of the commencement of their employment relationship does not negate the fact that the relationship commenced. In essence, Plaintiff argues that Defendants' pre-employment conduct induced the AMG employees to end their employment relationship sooner than they otherwise would have. This argument cannot carry a claim for tortious interference with a prospective at-will employment relationship.

### b) Contractual Relationships with Clients

Plaintiff next alleges that Defendants interfered with contractual relationships between WSFS/BMT and their clients. It is undisputed that BMT referred some of their banking clients to Defendants to receive wealth management services from the AMG, and that BMT received a share of revenue generated by AMG clients through their agreement with Cresap. Wellman Dep. at 31:16-20; Campbell Dep. at 73:4-24, 75:8-17. However, it is also undisputed that the services provided by Cresap and those provided by BMT were distinct and shared clients had separate contractual relationships with each entity. Brokerage at ¶15. WSFS has not identified any client contract to which they are a party that Defendants interfered with. The client relationships with which Plaintiff alleges Defendants interfered are contractual relationships between clients and Cresap relating to their wealth management, which BMT/WSFS benefited from through their separate contractual relationship with Cresap. WSFS stopped enjoying the benefit of the contractual relationships between Cresap and clients when WSFS themselves chose to terminate the BSA and transfer to Commonwealth. Plaintiff has not alleged or entered any facts into the record showing that Defendants did anything to interfere with contractual relationships BMT/WSFS may have with clients relating to their banking services. Accordingly, this Court finds no evidence or disputed facts of record which may support a claim for tortious interference with contractual relationships between WSFS/BMT and clients.

### c) Business Relationships with Clients

Finally, Plaintiff alleges that Defendants also interfered with the business relationships between WSFS/BMT and the AMG clients. WSFS argues that they had business relationships with the clients because "[m]any came to the AMG through pre-existing relationships with the Bank or its employees, and BMT was the public face of the client relationship" and that Defendants interfered with those relationships by "soliciting WSFS's clients to stop doing business with it." Response at 20. It is undisputed that BMT referred clients to Defendants and that Defendants held themselves out to be affiliated with BMT publicly. However, it is also undisputed that fiduciary relationships existed between the clients and Cresap, and BMT/WSFS was not party to those relationships. BMT benefited from the relationships to the extent that the BSA provided for BMT to receive a portion of the fees generated by the client's accounts, but this arrangement was between Cresap and BMT and did not involve the clients or Defendants. BMT may have maintained an independent banking relationship with clients, but they were not involved in the brokerage relationship between clients, Defendants, and Cresap. There is no evidence indicating that clients ended their banking relationships with BMT.

WSFS also argues that Defendants actions will prevent them from having *future* business relationships with the clients because the referral relationship will no longer exist. However, this is not an accurate description of the evidence presented. It is not the actions of defendants that hinders future revenue sharing, but rather the decision of WSFS to end their relationship with Cresap in favor of Commonwealth. Defendants' involvement in this shift is only a reaction to the actions of WSFS. There is also no evidence presented by Plaintiff which indicates that Defendants will no longer refer clients to WSFS for their banking needs. Plaintiff has not alleged

that Defendants are working with another bank or any other entity which can provide clients with the same services which WSFS offers.

Further, any possible of future relationships between WSFS and the clients are too tenuous to support a claim. To prevail on a tortious interference claim based on potential future business relationships, Plaintiff must prove that there was a reasonable probability that absent Cobb and Campbell notifying their clients of their change in employment, those clients would have made the transition to Commonwealth with WSFS. Plaintiff has not presented evidence to support this conclusion. Defendants clearly have established relationships with their clients. The clients trusted Defendants with their money and to make crucial financial management decisions for years. Additionally, based on the evidence of record, Defendants' only contact with their clients was the email in which they simply notified clients that they would be continuing their employment with exclusively Cresap, which was consistent with FINRA requirements. They did not make any effort to convince the clients to keep their business with them at Cresap or to prevent them from following WSFS to Commonwealth. This Court cannot find any reasonable likelihood that, absent Defendants' January 4, 2022, email, the clients would have ended their relationship with Cresap and entered into a relationship with Commonwealth and WSFS.

### d)  Specific Intent to Harm WSFS

Lastly, there is no evidence that Defendants acted with a specific intent to harm WSFS. Instead, the evidence shows that they chose to stay at Cresap because they had concerns about losing clients if they left for Commonwealth and that they communicated that concern to WSFS prior to the merge. Defendants expressed their opinion that Commonwealth was an inferior platform compared to Cresap and that it would not be in the clients' best interest to transfer their business. As to the other AMG employees, it is undisputed that Ulrich's resignation was unrelated to Defendants and that Cedatol and Wilf had working relationships with Defendants that predated their employment at BMT. Defendants asked BMT and WSFS representatives to ensure that Cedatol and Wilf remained assigned to their Group after the merge, making it clear that Defendants sought to maintain their working relationship with Cedatol and Wilf for their own interests, not simply to harm WSFS. See ECF Nos. 48-9,10.

For the forgoing reasons, Plaintiff's claims for Tortious Interference (Counts IV and V) fail as a matter of law.

### E.  Unfair Competition (Count VI)

Per the Restatement (3d) of Unfair Competition § 1, a defendant is liable for unfair competition if (a) he engages in deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, or acts or practices that are actionable under federal or state statutes, and (b) his conduct causes harm to the plaintiff's commercial relations.

"Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees." *Synthes (USA) v. Globus Med., Inc.*, No. 04-CV-1235, 2005 U.S. Dist. LEXIS 19962, at \*24-25 (E.D. Pa. Sep. 14, 2005). "[T]he offering of employment to a person under a contract, terminable at the will of either, with another is not actionable in and of itself." *Albee Homes, Inc. v. Caddie Homes, Inc.*, 417 Pa. 177, 207 A.2d 768, 771 (Pa. 1965). The "systematic inducing of employe[es] to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employe[es]." *Id.* An unfair competition claim has been permitted where defendants were alleged to have "planned and executed an en masse resignation" of a company's employees. *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F. Supp. 3d 465, 477 (E.D. Pa. 2014) (internal citations omitted). See also *Ecosave Automation, Inc. v. Del. Valley Automation LLC*, 540 F. Supp. 3d 491, 498 (E.D. Pa. 2021); *Albee Homes, Inc. v. Caddie Homes, Inc*., 207 A.2d 768, 771 (Pa. 1965); *Boyce v. Smith-Edwards-Dunlap Co.*, 580 A.2d 1382, 1390 (Pa. Super. 1990).

Here, Plaintiff argues that Defendants' coordination with each other, Wilf, Cedotal, and Ulrich, as well as the temporal proximity of their resignations, shows that Defendants orchestrated an en masse resignation, and that through their scheme Defendants arrogated to themselves WSFS's client relationships.

As previously discussed, the evidence of record demonstrates that Ulrich left WSFS in favor of Cresap of his own accord and his resignation was not associated with the resignation of the other AMG employees. Fox Dep. at 186-187; Ulrich Dep. at 171:18-172:15. The relevant resignations here are those of the Cobb, Campbell, Cedatol, and Wilf. The timing of the resignations and the well-established communications between the employees prior to resigning clearly demonstrate coordination. However, coordination does not equate systemic inducement for the purposes of an unfair competition claim. See *Ozburn-Hessey Logistics, LLC,* 13 F.Supp. at 478 ("Even accepting OHL's allegation that they 'coordinated their resignations' and 'encouraged each other,' this does not make out the elements of the claim.").

Plaintiff has failed to identify any evidence to support a finding that Defendants acted with the purpose of crippling or destroying an integral part of WSFS's business. WSFS employees testified that WSFS made a calculated decision not offer retention bonuses to Campbell, Ulrich, Cedatol, or Wilf because they were not critical and WSFS already had other employees who performed similar functions. Fox Dep. at 222:1-10, 223:1-224:10; Bacci Dep. 52:8-17, ECF No. 48-17. It would be unreasonable to conclude that the resignations of Cedatol and Wilf crippled WSFS because they served as support staff to Defendants and Ulrich and had no direct client relationships of their own.

Additionally, there is no evidence which could support a finding that Defendants induced AMG employees to leave for the purpose of disclosing trade secrets or enticing away costumers because they each already had access to any trade secrets the others could have provided, and the AMG clients already had contractual relationships with Cresap. As previously discussed, all

wealth management clients held contractual relationships directly with Cresap and all client information was stored on Cresap's platform pursuant to the terms of the BSA. Defendants, Wilf, and Cedatol all had access to client account information as dual employees of Cresap and did not access that information through their employment with BMT. To the extent that Defendants may seek access to BMT trade secrets, each Defendant, Wilf, and Cedatol had an equal opportunity to access such information as BMT employees. Therefore, inducing Wilf and Cedatol to join them in their employment with Cresap would not have provided Defendants access to any trade secrets to which they were not otherwise privy.

The undisputed facts of record clearly establish that Cobb and Campbell did not act with the motive of harming WSFS. Instead, they were motivated to continue employment with Cresap because that would result in better pay and client services, and they were motivated to hire Cedatol and Wilf because they had had long-standing working relationships with those employees which made them particularly gifted and skilled at meeting the specific needs of Defendants. Accordingly, Plaintiff's claim for Unfair Competition (Count VI) fails as a matter of law.

### F.  Civil Conspiracy (Count VII)

In Pennsylvania, "[t]o prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co*., 412 A.2d 466, 472 (Pa. 1979). An "'actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor.'" *Levin v. Upper Makefield Twp*., 90 Fed.Appx. 653, 667 (3d Cir. 2004), quoting *In re Orthopedic Bone Screw Prods. Liab. Litig*., 193 F.3d 781, 789 (3d Cir. 1999).

"Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy. This unlawful intent must be absent justification." *Levin,* 90 Fed.Appx at 667. Judge O'Neill thoroughly discussed the malice requirement in a claim for Civil Conspiracy in *DePuy Synthes Sales, Inc. v. Globus Med., Inc*.:

> "Malice requires an allegation that the sole purpose of the conspiracy was to injure the plaintiff," and that this intent was without justification. *Doltz v. Harris & Assoc.*, 280 F.Supp.2d 377, 389 (E.D. Pa. 2003). Thus, a showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a finding of malice. See *Sarpolis v. Tereshko*, 26 F.Supp.3d 407, 423–24 (E.D. Pa. 2014) (declining to infer malice where complaint explicitly averred that "all parties reaped financial or career benefits, at Plaintiff's expense" as a result of the alleged conspiracy), aff'd, 625 Fed.Appx. 594 (3d Cir. 2016); *Giordano v. Claudio*, 714 F.Supp.2d 508, 534 (E.D. Pa. 2010) ("A showing that an alleged conspirator acted for professional or business benefit will preclude a finding of malice."); *Bro–Tech Corp. v. Thermax, Inc.,* 651 F.Supp.2d 378, 419 (E.D. Pa. 2009) (holding that plaintiff's theory that defendants acted for their business advantage and benefit belies the notice that defendants acted purely out of malice and without a business motive, thereby precluding a civil conspiracy claim); *Thompson Coal Co.*, 412 A.2d at 472 (noting that the intent to injure must be without justification, which cannot exist when an act is merely done

"with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights"), quoting *Rosenblum v. Rosenblum*, 320 Pa. 103, 181 A. 583, 585 (1935).

259 F. Supp. 3d 225, 248 (E.D. Pa. 2017).

Here, WSFS has failed to show any evidence of malice. The undisputed facts establish that Defendants expressed concerns about losing business and money as a result of moving from Cresap to Commonwealth prior to the merge and that they stood to make a lot more money if they continued their employment directly with Cresap. See Campbell Dep. at 40:10-42:3; Cobb Dep. at 86:11–15; ECF No. 48-10. Because the undisputed facts show that the Defendants acted for their own business advantage rather than solely to harm Plaintiff, this claim fails.

### G. Unjust Enrichment (Count VIII)

To sustain a claim for unjust enrichment, a plaintiff must establish "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa.Super. 2006) (internal citations omitted).

In their Complaint, Plaintiff alleges BMT/WSFS conferred the benefit of access to confidential internal and client information upon Defendants and Defendants retained this information and enriched themselves with it at the expense of BMT/WSFS. Am. Compl. at ¶¶ 96–98. Plaintiff now also alleges that: "(1) BMT/WSFS for years provided Defendants with referrals and other support to help them gain and service clients, (2) Defendants obtained lucrative relationships using that support, and (3) Defendants absconded with those relationships, and the resulting revenue, through breaches of fiduciary duty." Response at § VI (internal citations to the record omitted).

The allegations regarding confidential information should proceed for the jury to determine whether the information sent to Cobb's and Wilf's personal emails constituted a benefit from WSFS for which WSFS was not compensated. However, the allegations regarding client relationships are less convincing. It is undisputed that BMT referred clients to the AMG and that Defendants worked under the BMT and boasted the brand publicly, however those benefits were conferred according to the terms of Defendants employment contracts and the BSA. BMT received a benefit in return according to the terms of those agreements, specifically by receiving a portion of all service generated by the AMG employees from May of 2009 through December of 2021. It has also already been determined that Defendants did not breach a fiduciary duty with regards to the client relationships and WSFS lost the resulting revenue due to their own decision to end their relationship with Cresap. Therefore, Plaintiff's claim for Unjust Enrichment (Count VIII) fails as a matter of law.

### H. Gist of the Action Doctrine

Defendants argue that Counts I, IV, V, VI, and VII are barred by the Gist of the Action Doctrine. Because Counts IV, V, VI, and VII fail on the merits for the reasons previously

discussed, they need not be further analyzed under the Gist of the Action Doctrine. Accordingly, only Count I (Breach of Fiduciary Duty) remains for discussion.

Under Pennsylvania law, the "gist of the action" doctrine "precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *Jones v. ABN Amro Mortg. Grp., Inc*., 606 F.3d 119, 123 (3d Cir. 2010) (quoting *Erie Ins. Exch. v. Abbott Furnace Co*., 972 A.2d 1232, 1238 (2009). Judge Buckwalter explained that:

> The doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort.

*Brown & Brown, Inc. v. Cola,* 745 F. Supp. 2d 588, 619-20 (E.D. Pa. 2010) (quoting *eToll, Inc. v. Elias/Savion Advertising, Inc*., 811 A.2d 10, 19 (Pa. Super. 2002)).

The applicability of the doctrine is a question of law. *See Synthes, Inc.,* 25 F. Supp. 3d at 724 (E.D. Pa. 2014). However, the Pennsylvania Supreme Court has not articulated a standard used to determine if a claim implicates a broader social duty owed to all individuals. Indeed, the Third Circuit has recognized that the gist of the action doctrine "cannot be captured by any precisely worded test. Instead, [it calls] for a fact-intensive judgment as to the true nature of a claim." *Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 386 (3d Cir. 2004); see also *Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC,* 784 F.3d 177, 186 (3d Cir. 2015). "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 69 (Pa. 2014).

A breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty allegedly broken is based in the defendant's contractual obligations. *DePuy Synthes Sales, Inc.*, 259 F. Supp. 3d at 234 (citing *Alpart v. Gen. Land Partners, Inc*., 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008)). Typically, breach of fiduciary duty claims *are not* barred under the gist of the action doctrine if the fiduciary duty "goes beyond the particular obligations contained in the parties' contract." *Id.* at 235. However, breach of fiduciary duty claims *are* barred by the doctrine if there are "no allegations of breach of fiduciary duty ... that transcend or exist outside of the parties' contractual agreements." *Id.*

At this time, the surviving factual bases of the fiduciary duty claim are that Defendants induced each other, Wilf, and Cedatol to terminate their employment with BMT and that Cobb misappropriated confidential BMT information when he emailed himself documents. This is the same alleged conduct which supports Plaintiff's claims for breach of contract. However, if the restrictive covenants signed by the Defendants did not exist, or they are found to be

unenforceable as Defendants argue, Defendants would still have owed BMT a fiduciary duty of loyalty as employees.

The notion that the obligations owed in tort and in contract are separate is illustrated by Campbell's own argument in response to Plaintiff's contract claim. Campbell argues the restrictive covenants underlying Plaintiff's breach of contract claim are distinct from his employment agreements with BMT because they were executed several years after his employment began. According to *Synthes, Inc.*, a fiduciary duty of loyalty existed throughout Campbell's employment, even when he had not yet signed a restrictive covenant. 25 F. Supp. at 667 Defendants seem to be attempting to argue both that the restrictive covenant is so central to Campbell's employment relationship that he cannot be said to owe separate duties under the covenant and generally as employees, while also arguing that the covenant is too removed from his employment agreement to be enforceable. Because the fiduciary duty claim can exist outside the parties' contractual agreements, the claim is not barred by the Gist of the Action Doctrine.

## I. Breach of RSU (Counterclaim Count I)

In his first Counterclaim, Cobb alleges that BMT, and so WSFS through merger, violated the terms of the RSU that Cobb signed in 2019 by failing provide vested shares.

Paragraph 7 of the RSU provides as follows:

> "In the event of a Change in Control, Grantee's outstanding RSUs will be deemed to have vested and any shares underlying such RSUs not previously issued shall be issued within ten days after the Change in Control."

Restricted Stock Unit Agreement for Execs. ¶7, ECF No. 48-37.

Paragraph 4 of the RSU provides as follows:

> If, at any time during the Service Period, or for a period of two years after termination of Grantee's employment for any reason, Grantee engages in any activity inimical, contrary or harmful to the interests of the Company Group, including but not limited to (A) conduct related to Grantee's employment for which either criminal or civil penalties against Grantee may be brought, … (C) soliciting any customer of the Company Group for business which would result in the customer terminating their relationship with the Company Group, (D) soliciting or inducing any individual who is an employee or director of the Company Group to leave the Company Group or otherwise terminate their relationship with the Company Group, (E) disclosing or using any confidential information or material concerning the Company Group, (F) breach of any agreement between the Grantee and Company Group … <u>then all RSU that have not yet vested *effective as of the date on which Grantee engages in such activity* … shall be forfeited in their entirety.</u> (emphasis added).

Id. at ¶4.

Cobb argues that the shares vested on the date of the merge pursuant to Paragraph 7, and that WSFS violated the RSU when they failed to provide such shares within ten days of the date of the merge. In response, Plaintiff alleges that Defendant engaged in activities which would lead to forfeiture of Defendant's shares under Paragraph 4 prior to the date of the merge when he induced the AMG employees to resign, solicited BMT clients, and emailed confidential information to his personal email address. Therefore, the shares were forfeited before they vested, and Cobb is not entitled to those shares.

As has been thoroughly discussed, Cobb did not solicit clients or induce Ulrich to resign. However, whether Cobb induced Campbell, Cedatol and Wilf to resign and whether he used any confidential material concerning BMT are disputed questions of fact which must be submitted to the jury. Therefore, summary judgement is not appropriate as to this Counterclaim.

### J.  Violation of the WPCL (Counterclaim Count II)

In his second Counterclaim, Cobb alleges that WSFS violated the WPCL when they failed to pay him his salary for the month of December 2021.

Under the WPCL, an employee to whom any type of wage is payable may bring a claim to recover unpaid wages and liquidated damages in any court of competent jurisdiction. 43 P.S. § 260.9a. The WPCL provides that a plaintiff may recover liquidated damages amounting to 25% of the unpaid wages, in addition to the wages owed, where the wages remain unpaid for thirty days beyond the regularly scheduled payday, only if "no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment." 43 P.S. § 260.10. The employer bears the burden of proving by clear and convincing evidence that they acted in good faith in withholding wages. See *Hirsch v. EPL Technologies, Inc*., 910 A.2d 84 (Pa. Super. 2006); *Hartman v. Baker*, 766 A.2d 347 (Pa. Super. 2000).

WSFS argues that Cobb's alleged breaches of duty and contract provide WSFS with a good faith basis to withhold wages for the month of December. Analysis of this claims requires the finder of fact to answer two questions: 1) do Cobb's alleged violations (inducing soliciting AMG employees and emailing information to himself) create a set-off on his wages from December; and 2) did WSFS have a good-faith basis to believe there was a set-off? These questions cannot be answered until the fact finder determines if Cobb violated his restrictive covenants or committed other tortious acts. If the jury finds Cobb to be liable for his alleged conduct, the jury must then determine whether such conduct created a set-off against his December wages. Finally, the jury will examine the motive of WSFS in withhold pay. Given these outstanding questions of disputed fact, summary judgement is inappropriate as to this claim.

### IV.  CONCLUSION

For the foregoing reasons, Defendants' Joint Motion for Summary Judgement is GRANTED IN PART and DENIED IN PART. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **WSFS FINANCIAL CORPORATION,** and | : | |
| **WILMINGTON SAVINGS FUND** | : | **CIVIL ACTION** |
| **SOCIETY, FSB** d/b/a **WSFS BANK** | : | |
| Plaintiffs, | : | |
| **v.** | : | |
| | : | |
| **RICHARD K. COBB, JR.,** and | : | **NO. 2:22-cv-815-MRP** |
| **F. CHRISTOPHER CAMPBELL** | : | |
| Defendants. | : | |


**ORDER**


**NOW,** this 14th day of July, 2023, it is hereby **ORDERED** that Defendants' Joint

Motion for Summary Judgement is hereby **GRANTED IN PART** and **DENIED IN PART** as

follows:


1. Defendants' Joint Motion for Summary Judgement on Count I (Breach of Fiduciary –

    Cobb and Campbell) Duty is **GRANTED** only to the extent the claim alleges

    solicitation of clients, inducement of John Ulrich to terminate his employment with

    WSFS, and concealment of an intent to resign, but; **DENIED** to the extent the claim

    alleges use of confidential information and inducement of Christopher Campbell,

    Richard Cobb, Jessica Wilf, and Tara Cedatol to terminate their employment with

    WSFS;

2. Defendants' Joint Motion for Summary Judgement on Count II (Breach of Contract –

    Cobb) is **GRANTED** only to the extent the claim alleges solicitation of clients and

inducement of John Ulrich to terminate his employment with WSFS, but; **DENIED** to the extent the motion alleges the Non-Disclosure and Non-Solicitation Agreement is unenforceable and to the extent the claim alleges use of confidential information and inducement of Chris Campbell, Tara Cedatol, and Jessica Wilf to terminate their employment with WSFS;

3. Defendants' Joint Motion for Summary Judgement on Count III (Breach of Contract – Campbell) is **GRANTED** only to the extent the claim alleges solicitation of clients and inducement of John Ulrich to terminate his employment with WSFS, but; **DENIED** to the extent the motion alleges the Non-Disclosure and Non-Solicitation Agreement is unenforceable and to the extent the claim alleges inducement of Richard Cobb, Tara Cedatol, and Jessica Wilf to terminate their employment with WSFS;

4. Defendants' Joint Motion for Summary Judgement on Count IV (Tortious Interference with Contracts – Cobb and Campbell) is **GRANTED**;

5. Defendants' Joint Motion for Summary Judgement on Count V (Tortious Interference with Business Relationships – Cobb and Campbell) is **GRANTED**;

6. Defendants' Joint Motion for Summary Judgement on Count VI (Unfair Competition – Cobb and Campbell) is **GRANTED**;

7. Defendants' Joint Motion for Summary Judgement on Count VII (Civil Conspiracy – Cobb and Campbell) is **GRANTED**;

8. Defendants' Joint Motion for Summary Judgement on Count VIII (Unjust Enrichment – Cobb and Campbell) is **GRANTED**;

9. Defendants' Joint Motion for Summary Judgement on Counts I-II of Richard Cobb's

   Counterclaims (Breach of the RSU Agreements & Violation of the Wage Payment and

   Collection Law) is **DENIED**.

                                        BY THE COURT:

                                        _____

                                        Hon. Mia R. Perez